1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| ALMUT REINICKE, | CASE NO. 12cv1405-GPC(KSC) |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| CREATIVE EMPIRE LLC, dba MANGOLANGUAGES.COM, a Michigan limited liability company; and DOES 1-10, inclusive | [Dkt. No. 41.] |
| Defendant. | |

11
12
13
14
15
16
17

Before the Court is Defendant Creative Empire, LLC's motion for summary judgment. (Dkt. No. 41.) Plaintiff filed an opposition, (Dkt. No. 44), and Defendant replied. (Dkt. No. 46.) A hearing was held on August 1, 2014. (Dkt. No. 47.) James Crosby, Esq. and Jamie Riderbeck, Esq. appeared on behalf of Plaintiff and Minh Zhen Kuo, Esq. and Elliot Gipson, Esq. appeared on behalf of Defendant. Based on the arguments, briefs, supporting documentation, and the applicable law, the Court GRANTS Defendant's motion for summary judgment.

## Procedural Background

On June 11, 2012, Plaintiff Almut Reinicke ("Plaintiff" or "Reinicke") filed a complaint against Defendant Creative Empire LLC d/b/a Mangolanguges.com ("Defendant" or "Mango") alleging causes of action for copyright infringement, conversion and quantum meruit as to the Work incorporated into Mango 2.0. (Dkt. No.

1.)  On October 23, 2012, the case was transferred to the undersigned judge.  (Dkt. No. 10.)  On January 24, 2013, the Court granted in part and denied in part Defendant's motion to dismiss for failure to state a claim and granted in part and denied in part Defendant's motion for a more definite statement.  (Dkt. No. 15.)  On February 21, 2013, Plaintiff filed a first amended complaint alleging causes of action for copyright infringement and quantum meruit.  (Dkt. No. 16.)

On May 9, 2014, Defendant filed a motion for summary judgment. (Dkt. No. 41.) Plaintiff filed an opposition on June 13, 2014.  (Dkt. No. 44.)  Defendant filed a reply on June 27, 2014.  (Dkt. No. 46.)

### Factual Background

Mango provides online language learning services through the Internet.  Mango began as Creative Empire, LLC which was formed in 2004 as an e-commerce company selling niche products over the internet.   The company relaunched in 2007 as Mangolanguages.com, its focus being the development of an internet-based language learning system.   Mango began development of its first online language learning product, Mango 1.0, in 2006/2007.

Mike Goulas ("Goulas"), Mango's Director of Product Development, was in charge of managing the development of Mango 1.0 and recruiting foreign language developers to create the language content that would be incorporated into Mango's software.  Goulas used a website such as translatorcafe.com and pros.com to recruit Mango 1.0 language developers which included Plaintiff.  After working on a small translation project for Mango, Goulas retained Plaintiff to develop the German language course for Mango 1.0.  Because Mango had not yet generated any revenues, there was very little money available to compensate the language developers, so Mango offered to compensate in the form of a royalty based on the "net sale of all Source Language to Target Language courses."  (Dkt. No. 41-4, Goulas Decl., Ex. A ¶ 8.)

On February 5, 2007, the parties executed a Commission Agreement ("Agreement") governing Plaintiff's work on Mango 1.0.  (Dkt. No. 41-4, Goulas

Decl., Ex. A.)  Under the Agreement, Plaintiff developed 100 German lessons for Mango 1.0.  Mango 1.0 launched on September 1, 2007 with 100 lessons in 12 different languages.

The Commission Agreement provided a commission structure based on the "net sale of all Source Language to Target Language courses during the period from Commission Start Date to Commission End Date. (Dkt. No. 41-4, Goulas Decl., Ex. A ¶ 8.) In exchange, the Language Developers waived the $18,000 fee for service. (Id. ¶ 7.)  The commission percentage was as follows: 10% for the first year, 7% for the second year, and 5% for the third year.  (Id. ¶ 2.)  The Termination Fee was set at $56,000 which meant that at any time prior to the Commission End date, Mango had the right to terminate its obligation to pay further commission to the Developers by paying the termination fee.  (Id. ¶ 10.)  In the agreement, the developers assigned full copyright ownership over all content to Mango.  (Id. ¶ 5.)

In the fall of 2008, Mango began developing a variety of ideas and products. Plaintiff was interested in creating a higher quality product and negotiations regarding compensation for Mango 2.0 began.  Plaintiff wanted more favorable terms than her original Commission Agreement.  (Dkt. No. 41-4, Goulas Decl. ¶  9; Dkt. No. 44-1, Reinicke Decl. ¶¶ 14, 15.)  During discussions, Mango was amenable to Plaintiff's demand for the proposed commission of 10% and term length of five years, but they disagreed over one item, the amount of the buyout payment.  (Dkt. No. 41-4, Goulas Decl. ¶ 10; Dkt. No. 44-1, Reinicke Decl. ¶ 15.)  Plaintiff sought a buyout amount of $93,333 over five years.[1]   Mango was willing to pay $75,000 for a buyout provision for Mango 2.0.  No contract was ever executed or signed and discussions regarding commissions ended in early 2009.

From January to May 2009, while Plaintiff sent emails to Goulas to inquire about

---

[1]Reinicke sought $93,333 for Mango 2.0 explaining that since Mango 1.0 was set at $56,000 which breaks down to $18,666 per year for three years, $93,333 is based on $18,666 for the extended five year term. According to Mango, it viewed Plaintiff's request as seeking a buy-out term nearly double the buyout contained in her previous contract.

[12cv1405-GPC(KSC)]

resuming negotiations about the buyout provision, no negotiations regarding the buyout provision were held. (Dkt. No. 44-1, Reinicke Decl. 19-24; Exs. B-E.) During this time, Plaintiff began work on Mango 2.0. (Id. ¶ 18.)

On June 10, 2009, Goulas called and informed Plaintiff that Mango no longer agreed to the new five year contract for Mango 2.0. (Dkt. No. 41-4, Goulas Decl. ¶¶ 28, 29; Dkt. No. 44-1, Reinicke Decl.¶¶ 25, 26.) Instead, Goulas said that Mango would pay $25 per hour for a total of four hours for each lesson. (Id.) She declined to accept the offer and that she would rely solely on her Mango 1.0 commission and not work on Mango 2.0 anymore. (Dkt. No. 41-4, Goulas ¶ 30; Dkt. No. 44-1, Reinicke ¶ 26.) Later, the same day, she wrote an email where she said she thought "long and hard about this." (Dkt. No. 44-1, Reinicke Decl., Ex. H.) She wrote "[e]ven though we were under the impression for months we'd be getting 10% for 5 years. Oh well, okay, you changed my mind." (Id.) Her reasoning is that whatever work she puts into Mango 2.0 would help her own commission on Mango 1.0. (Id.) Since she was still promised commission on Mango 1.0 for an additional two years plus compensation for her hourly work on Mango 2.0, any improvement to Mango's product slate would drive overall sales of Mango 1.0. (Dkt. No. 44-1, Reinicke Decl. ¶ 27.) In June 2009, she agreed to a rate of $25 per hour for five hours per chapter. (Dkt. No. 45-3, Perakis Decl. ¶ 4; Dkt. No. 41-5, Kuo Decl., Ex. A, Almut Depo. at 89:23-90:8.)

In early August 2009, Mango halted production of the originally conceived Mango 2.0 project. The foreign language developers were instructed to abandon their current lessons and create brand new chapters according to a set of guidelines entitled "Traveling Tom." The teachers were given a 10 chapter unit outlines for Traveling Tom to govern the development of the chapters. Mango 2.0 would break down into about 10 chapters. Steven Perakis took over as Project Manager during the summer of 2009. (Dkt. No. 45-3, Perakis Decl. ¶ 2.)

Plaintiff submitted her first Traveling Tom lesson for Mango 2.0 in mid-late September 2009. During this time, she repeatedly emailed Mango throughout August

[12cv1405-GPC(KSC)]

and September to express her frustration over the failed commission negotiations and to ask for compensation for the time spent in fall 2008 on the discarded projects.

The next time that the issue of compensation came up was in October 2009. On September 30, 2009, Perakis emailed Plaintiff because no additional chapters had been submitted beyond lesson one. (Dkt. No. 44-1, Reinicke Decl., Ex. K at REINICKE000042.) Plaintiff responded that she was not satisfied with her current compensation and would not work on any other chapters without additional compensation. (Id. at REINICKE 000043.) Perakis responded and offered her $25 per hour for a total of 6 hours per chapter, an increase of 1 hour. (Id. at REINICKE000044.) She refused and wrote that she has put in more than 10 hours per lesson and her normal hourly rate is $40 for non-medical/general translation. (Id. at REINICKE000044.) She wrote, "I am open for either a new commission percentage as we had been promised last year, or another suggestion from your side." (Id.) Perakis responded stating that Mango was unable to pay her going rate and Mango had begun looking for a new German language developer. (Dkt. No. 43-3, Perakis Decl., Ex. G.) In response, she indicated that she would consider working again if Mango matched other German developers' rates. (Id.)

On October, 3, 2009, Plaintiff emailed Goulas to express her frustration and disappointment to Perakis' offer. (Dkt. No. 44-1, Reinicke Decl. ¶ 45, Ex. L; Dkt. No. 41-4, Goulas, Decl. ¶ 17, Ex. H.) Subsequently, Plaintiff and Goulas talked over the telephone on October 9, 2009. (Dkt. No. 44-1, Reinicke Decl. ¶ 47.) In that conversation, Goulas states that Plaintiff asked to rejoin Mango 2.0 on an hourly basis. (Dkt. No. 41-4, Goulas Decl. ¶18.) However, according to Plaintiff, they discussed the terms and conditions under which she would return to Mango. (Dkt. No. 44-1, Reinicke Decl. ¶ 47.) She states that Goulas promised that she would get paid for all hours spent on Mango 2.0 without any limit on the number of hours and that he wanted the compensation structure to be "fair" and wanted Plaintiff to move forward with completing Mango 2.0. (Id.) She stated that the only "fair" compensation was a

commission based structure and Goulas agreed and they discussed a new commission contract for Mango 2.0.  (Id.)  While he agreed, he said he would work out the details later since he was focused on having the developers complete the first two chapters of Mango 2.0 for its upcoming release.  (Id.)  Plaintiff states she returned to Mango based on Goulas' promise to give her "fair" compensation in the form of a new commission agreement.  (Id. ¶ 48.)

On October 9, 2009, Plaintiff rejoined Mango 2.0 under the new unlimited hour structure.  (Dkt. No. 45-3, Perakis Decl. ¶ 14.)  On October 9, 2009, Goulas sent out an email describing the new compensation plan to all the language developers.  (Dkt. No. 41-4, Goulas Decl. ¶ 19; Ex. I.)  Payment would be based on the hours they devote to Mango to include, "all training, developing, editing, reviewing, and communicating."  (Id.)  Attached to the email was a document entitled "Payment Plan" that detailed the terms under which the foreign language developers were to be paid.  (Id., Ex. J.)  In October and November 2009, Plaintiff was paid for all hours she billed.  (Id. ¶ 17; Dkt. No. 44-2, Reinicke Decl., Ex. N.)  Plaintiff was also paid for unpaid hours from the fall of 2008 that she spent on projects that were not used in Mango 2.0 (Dkt. No. 45-3, Perakis Decl. ¶¶ 9, 17; Exs. J, K.)  Mango 2.0 launched on November 23, 2009, with about 36 languages.  Only the first two of Plaintiff's Traveling Tom chapters were available upon launch.

On December 21, 2009, Mango changed its hourly compensation structure when it realized the costs associated with paying the developers on an unlimited hourly basis were astronomical.  (Dkt. No. 45-3, Perakis Decl. ¶ 18.)  Goulas emailed Plaintiff to inform her that after the first two chapters, compensation would be a flat fee of $300 per chapter.  (Dkt. No. 44-1, Reinicke Decl. ¶ 54; Dkt. No. 41-4 Goulas Decl. ¶ 21, Ex. K.)  She stated that Goulas never mentioned that Mango was changing the commission agreement they had agreed to in October 2009.  (Id.)  She wrote back contesting the

new compensation plan and proposed adjusting the "old commission percentage"[2] in order to justify the deduction to the hourly rate payment and fairly compensate her for her efforts.  (Id. ¶ 56, Ex. P.)

In late January 2010, Plaintiff submitted her timesheet for December 2009 and asked Perakis to clarify the $300/chapter compensation.  (Dkt. No. 45-3, Perakis Decl. 20, Ex. L.)  Perakis responded that Mango would compensate Reinicke for all time submitted through chapter 3, and from chapter 4 on, she would be paid $300 per chapter plan.  (Id.)  She accepted the chapter payment from chapter 4 forward.  (Id. at MANGO0002465.)  Perakis responded that "$300 is conclusion (sic) of everything" to include not only development of the lesson but also "wordification, fragmentation, phonetics, review of audio files, etc." (Id. at MANGO0002465-66.)  He also noted that a bonus would be paid following completion of a unit.  (Id.)

On January 31, 2010, Plaintiff wrote to Diana McGraw, another foreign language developer, and wrote a long email complaining about the amount in her check and commented "this is the worst paying job ever. . .Why don't they listen to us, again? Why don't they say, okay, we can't pay you for hours but if you do well and we sell more because you do well, you will benefit too, meaning a higher % for next year in addition to 300$." (Dkt. No. 41-5, Kuo Decl., Ex. D.)

Plaintiff continued to work under the per chapter compensation until the first unit of ten chapters was complete on May 1, 2010.  She was paid a total of $9,050.00 for her work on Mango 2.0.  (Dkt. No. 44-1, Reinicke Decl. ¶ 78.)  On July 2, 2010, Perakis told Plaintiff that her course was "excellent and that Mango was offering her a raise to $425 per chapter to continue to develop additional chapters. (Dkt. No. 44-1, Reinicke Decl., Ex. S.)

In the spring of 2010, she grew increasingly frustrated about her compensation. By summer of 2010, she became unresponsive and unreachable.  Having not received

---

[2]It is not clear whether the commission agreement mentioned is prior negotiations of a commission agreement or the alleged commission agreement Goulas agreed to in October 2009 to persuade Plaintiff to return to Mango.

any additional chapters for three months, Mango terminated its relationship with Plaintiff on August 3, 2010.  In mid-2010, Mango began selling the full version, chapters 1-10 of Mango 2.0  Mango hired another foreign language developer to complete the German course and today offers 40 chapters in German.

The copyrighted Work is the first ten chapters of the German language course in Mango 2.0 which breaks down into 108 lessons. (Dkt. No. 44-1, Reinicke Decl. ¶ 31.)  In order to obtain compensation for her Mango 1.0 contract, she went to arbitration and was paid $54,690.74 for her work on Mango 1.0. (Id. ¶ 77.)  She was paid a total of $9,050.00 for work in conjunction with Mango 2.0.

On October 5, 2010, Plaintiff sent Mango a letter through her counsel asking Mango to cease and desist using Plaintiff's copyrighted Work in Mango 2.0. (Dkt. No. 45-3, Perakis Decl. 31, Ex. P.)

## Discussion

### A.  Legal Standard on Motion for Summary Judgment

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action. " Celotex Corp. v. Catrett, 477 U.S. 317, 325, 327 (1986).  Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material when it affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. Celotex Corp., 477 U.S. at 323.  The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. Id. at 322-23.  If the moving party fails to bear the

initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. Id. at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." Fontana v. Haskin, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. Anderson, 477 U.S. at 255.

## B. Copyright Infringement

Mango argues it is entitled to summary judgment on the copyright infringement claim based on its affirmative defense that Plaintiff conveyed an implied, unlimited, and irrevocable license to the Work. Plaintiff asserts that there is a genuine issue of material fact as to whether she intended that Mango would copy and distribute her work.

A copyright infringement claim has two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publ'ns. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 361 (1991). Defendant does not challenge whether these elements have been met but instead, asserts an affirmative defense to copyright infringement, arguing it received a non-exclusive license to use

Plaintiff's Work.  See Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 559 (9th Cir. 1990).  An exclusive license must be in writing.  See 17 U.S.C. § 204.  However, a copyright owner may grant a nonexclusive license expressly or impliedly through conduct.  Asset Mktg. Sys., Inc. v. Gagnon, 542 F.3d 748, 754 (9th Cir. 2008)  The Ninth Circuit has held that an implied non-exclusive license is granted when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." Id. at 754-55 (quoting I.A.E., Inc. v. Shaver, 74 F.3d 768, 776 (7th Cir. 1996)).

When considering the third element, the licensor's intent, courts consider whether the totality of the parties' conduct indicates that the licensor intended to grant the licensee permission to use the work.  Michaels v. Internet Entm't Grp., Inc., 5 F. Supp. 2d 823, 831 (C.D. Cal.1998); Montwillo v. Tull, 632 F. Supp. 2d 917, 924 (N.D. Cal. 2008).  Moreover, the relevant intent is "the licensor's objective intent at the time of the creation and delivery," not subjective intent.  Assets Mktg. Sys. Inc., 542 F.3d at 756. Intent to create a license exists when an author creates a work with the knowledge and intention that it will be used by the licensee for a specific purpose. Bangkok Broad. & T.V. Co., Ltd. v. IPTV Corp., 742 F. Supp. 2d 1101, 1111 (C.D. Cal. 2010) (quoting SHL Imaging, Inc. v. Artisan House, Inc., 117 F. Supp. 2d 301, 317 (S.D.N.Y. 2000)).

The Ninth Circuit found the factors from the First and Fourth Circuits to determine a licensor's intent persuasive.

> (1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts . . . providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.

Asset Marketing Sys., 542 F.3d at 756 (citing John G. Danielson, Inc. v.

1   Winchester-Conant Props., Inc., 322 F.3d 26, 41 (1st Cir. 2003) (quoting

2   Nelson-Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505, 516 (4th Cir. 2002)).

3        As to the first factor, length of the relationship, the existence of an implied

4   nonexclusive license turns on whether the parties were engaged in a short-term discrete

5   transaction as opposed to an ongoing relationship.  See Danielson, Inc., 322 F.3d at 41.

6   A longer relationship weighs against finding an implied license.  Fontana v. Harra, No.

7   CV 12-10708 CAS (JCGx), 2013 WL 990014, at *6 (C.D. Cal. Mar. 12, 2013).  A

8   longer ongoing relationship indicates that the parties contemplated that the creator

9   would participate in future projects while short, discrete tasks reveal that the parties

10  only intended the creator's work to be a discrete contribution and that others could use

11  the creator's work in future projects.  Id.; see also Nelson-Salabes, Inc., 284 F.3d at

12  516.  However, the court in Fontana noted the factors should be applied flexibly

13  depending on the facts of each case because some courts have held that the existence

14  of an ongoing relationship weighed in favor of finding the existence of an implied

15  license.  Fontana, 2013 WL 990014 at 7.  In this case, Reinicke and Mango had a

16  relationship where Reinicke created the German language programs for Mango to use

17  in Mango 1.0 and later in Mango 2.0, a limited and discrete task.  In applying the test,

18  the short-term discrete transaction between Reinicke and Mango weighs in favor of

19  finding an implied license.  Moreover, as to the second and third factors, no other

20  conduct or written contract exists that use of Plaintiff's Work could not be used without

21  her permission or that her Work could be only used with her future involvement or

22  express permission.  These factors support a finding of an implied license.

23        In Effects Assocs., the defendant, a horror film producer, engaged the plaintiff,

24  a special effects company, to create effects for a new horror movie.  Effects Assocs.,

25  908 F.2d at 555–56. The parties orally agreed upon a price and the plaintiff delivered

26  the footage. Id. The defendant was not happy with the footage so he paid only half of

27  the promised amount. Id. at 556.  The defendant, however, used the footage in the film

28  and the plaintiff sued for copyright infringement. The district court and the Ninth

Circuit concluded that the parties' conduct created an implied license to use the effects footage in the film. Id. at 559.

In the case, the plaintiff unsuccessfully argued that since the defendant did not pay the full agreed to price, an implied license was not granted. Id. at 558. In addressing the plaintiff's argument, the Ninth Circuit stated "we [cannot] construe payment in full as a condition precedent to implying a license. Conditions precedent are disfavored and will not be read into a contract unless required by plain, unambiguous language." Id. at 559 n.7. The court explained that the agreement between the parties did not support a conclusion that full payment was a condition precedent to the defendant's use of the footage and plaintiff conceded, at a deposition, that he never told the defendant that a failure to pay would be viewed as copyright infringement. Id.

In another case, the plaintiff, a screenwriter, filed a copyright infringement action against defendant for use of his screenplay without full payment. Fontana v. Harra, No. CV 12-10708 CAS (JCGx), 2013 WL 990014 (C.D. Cal. Mar. 12, 2013). The plaintiff and the defendant orally agreed that plaintiff would write the script and defendant would pay an advance of $13,000 with unspecified additional fees to be paid out of the first funds invested in the film. Id. at 1. They agreed that no portion of the script would be used by any defendant for any purpose unless and until plaintiff was paid the full amount that he was owed. Id. He received $13,000 and Plaintiff completed a draft of the screenplay and delivered it to defendants who were pleased. Id. The plaintiff alleged that he was promised a substantially greater amount of money for his screenwriting and claimed rights to a portion of the film's net profits and gross revenues. Id.

The issue before the court was on the third factor, whether the plaintiff delivered the screenplay with the intent to allow the defendants to use it to promote and create a film. Id. at 4. The plaintiff argued that he never intended to allow defendants to use the script until he received full payment. Id. The district court concluded that failure

to provide payment in full generally cannot void an implied license arising from either conduct or an oral agreement. Id. at 5 (citing Effects Assocs., 908 F.2d at 558-59). This can only happen if the agreement giving rise to the license contains a condition precedent clause requiring full payment. Id.

In Effects Assocs. and Fontana, both courts noted, a plaintiff, making such an argument, has a proper cause of action for breach of contract, not copyright infringement. Id. at 6; Effects Assocs., 908 F.2d at 559.

Similarly, in this case, there is no "plain, unambiguous evidence" that commission payments were a condition precedent to Mango's use of the Work. See Effects Assocs., 908 F.3d at 559 n.7. While discussions as to a contract as to Mango 2.0 were discussed, it was never put down in writing and never executed. There is no evidence, oral, written or implied, that Plaintiff intended to limit Mango's use of the programs. Plaintiff knew when she submitted the Traveling Tom lessons to Mango that they were going to be incorporated into Mango 2.0 for sale to customers on the internet. (Dkt. No. 41-5, Kuo Decl., Ex. A, Reinicke Depo at 206:17–207:13.) Reinicke created that Work with the understanding that it would be given to Mango for use on the Internet. She delivered the Work to Mango without imposing any limitations on its use. The issue of copyright infringement did not occur until the relationship ended. See Asset Mkgt Sys., 542 F.3d at 757.

Plaintiff contends that her intent to grant Mango an implied license to use her Work is undercut by the monetary amounts involved. She claims that during negotiations of contract for Mango 2.0, Goulas agreed to the terms of a commission; however both parties disagreed on the buyout provision. Mango agreed to pay $75,000 but Plaintiff requested $93,333. Therefore, the fact that she only got paid $9,050 for Mango 2.0 cannot support an irrevocable, unlimited, implied license. Plaintiff cites to Michaels v. Internet Enter. Grp., 5 F. Supp. 2d 823, 833 (C.D. Cal. 1998); however the case is not persuasive as it involved a convoluted set of facts that clearly demonstrated an absence of an implied license.

[12cv1405-GPC(KSC)]

In <u>Michaels</u>, the Plaintiff, a rock star, and the holder of copyright on a sex videotape ("Tape") sued the defendant, the possessor of a copy involved in distributing the Tape on the Internet.   <u>Id.</u> at 828.   An "agent of Michaels" sold the rights in the Tape to the defendant.   <u>Id.</u>   However, the agreement was between the defendant and Revilla, a private investigator where Revilla's "undisclosed client" conveyed rights in the Tape. <u>Id.</u> at 829.   Revilla would not reveal the name of his client but stated that his client was an associate of Michael who received the Tape as a gift.   <u>Id.</u>   The court concluded that the possessor did not have a nonexclusive license under the copyright since there was no evidence that the plaintiff, the holder, turned over the tape to the Defendant or the unnamed agent under circumstances indicating his agreement that it be distributed on the Internet. <u>Id.</u> at 833.   The court also noted that the defendant's account of the facts is undermined by the monetary amounts involved based on the fact that Michaels and his agents first refused to grant a license for $1 million and six months later granted a license in the same property for $31,500.   <u>Id.</u>   The court questioned the $1 million offer by Revilla to Michaels for rights to the Tape, which would indicate that Revilla's client must not have had authority to negotiate a license on Michael's behalf, as alleged.   <u>Id.</u>

While the court in <u>Michaels</u> looked to the monetary amounts involved, it was one of many factors the court looked at in coming to its conclusion.   In this case, while there is a gap between $9,050, the amount she received for work done on Mango 2.0 and $54,690.74, the amount she received for work done on Mango 1.0, the gap is not as outrageous as between $31,500 and $1 million for this Court to conclude that there was not an implied license based solely on the monetary amounts.

Second, Plaintiff opposes arguing that her willingness to create her course was based on Mango's repeated promises of a commission payment on the net sale of Mango 2.0.   She would not have created the course if she knew Mango would not pay her commission payments as promised.   (Dkt. No. 44-1, Reinicke Decl. ¶¶ 17, 18, 60.) In fact, she stopped creating and developing further chapters for Mango 2.0 when she

[12cv1405-GPC(KSC)]

1  realized Goulas may not have intended to honor his promises to pay her a commission.

2  However, Ninth Circuit law is clear that "full payment" is not a condition

3  precedent to Mango's use of the Work.  See Effects Assocs., 908 F.2d at 558-559.

4  There is no indication that her alleged promises of a commission, which would amount

5  to "full payment" was contingent on the copyright use.  As in Effects Assocs., there is

6  no indication that failure to pay commission will be viewed as a copyright violation.

7  There was no condition precedent that would defeat a finding that Mango had an

8  implied license to use and distribute the Words that was created for it and delivered to

9  it by Plaintiff.  See id.

10  Moreover, the Court questions whether Plaintiff has raised a genuine issue of

11  material fact to survive summary judgment based on contradictions of facts.

12  Plaintiff gave up her request for a commission in exchange for an hourly rate on

13  June 10, 2009.  (Dkt. No. 44-1, Reinicke Decl. ¶ 13.)  Goulas told Plaintiff said that

14  Mango would not agree to the five year contract, and instead, would pay $25 per hour

15  for a total of four hours for each lesson.  (Dkt. No. 45-3, Perakis Decl. ¶ 4.)  Initially,

16  Plaintiff declined but later she wrote an email where she said she thought "long and

17  hard about this."  (Dkt. No. 41-4, Goulas Decl. ¶ 12; Dkt. No. 44-1, Reinicke Decl. ¶

18  26; Ex H.)  She wrote "[e]ven though we were under the impression for months we'd

19  be getting 10% for 5 years.  Oh well, okay, you changed my mind."  (Dkt. No. 44-1,

20  Reinicke Decl., Ex. H.)  As of June 10, 2009, Plaintiff knew the commission payment

21  was not agreed to by Mango.  Moreover, as of August 2009, Mango halted production

22  on Mango 2.0 projects and created new guidelines entitled "Traveling Tom."

23  The issue of the commission came up again on October 9, 2009 where Plaintiff

24  states, in a declaration, that Goulas agreed to a commission based compensation.  (Dkt.

25  No. 44-1, Reinicke Decl. ¶ 47.)  The only email referencing this alleged commission

26  plan was in an email in response to Mango's decision to change its compensation

27  structure from unlimited hours to a per chapter $300 flat fee on December 21, 2009.

28  Goulas emailed Plaintiff to inform her that after the first two chapters, compensation

would be a flat fee of $300 per chapter.  (Dkt. No. 44-1, Reinicke Decl. ¶ 54; Dkt. No. 41-4 Goulas Decl. ¶ 21, Ex. K.)  In response, she wrote back contesting the new compensation plan and proposed adjusting the "old commission percentage" in order to justify the deduction to the hourly rate payment and fairly compensate her for her efforts.  (Dkt. No. 44-1, Reinicke Decl. ¶ 56, Ex. P.)  In liberally construing the facts, it could be argued that she was referencing the alleged commission arrangement Goulas and Plaintiff agreed to on October 9, 2009.

Then on January 31, 2010, Plaintiff wrote an email to Diana McGraw, another foreign language developer, complaining about the amount of her check and commented "this is the worst paying job ever. . .Why don't they listen to us, again?  Why don't they say, okay, we can't pay you for hours but if you do well and we sell more because you do well, you will benefit too, meaning a higher % for next year in addition to 300$."  (Dkt. No. 41-5, Kuo Decl., Ex. D.)  This email suggests that there was never a commission promised by Goulas in October 2009.

The Court notes that the contradiction between her declaration and her email to Diana McGraw, raises a question whether Plaintiff has demonstrated a genuine issue of material fact as to whether Mango promised her commissions on Mango 2.0.  See Block v. City of Los Angeles, 253 F.3d 410, 419 n.2 (9th Cir. 2001) ("a party cannot create a genuine issue of material fact to survive summary judgment by contradicting his earlier version of the facts.")  However, the Court need not make a determination as the Court has concluded that Plaintiff impliedly granted a nonexclusive license to Mango, an affirmative defense to the copyright infringement cause of action.

Defendant further contends it has an irrevocable license becaus consideration of $9,000 was paid for the Work.  Plaintiff opposes arguing there is a genuine issue of material fact whether there was valuable consideration.

If consideration is paid, a license is irrevocable because a non exclusive license supported by consideration is a contract.  Asset Mktg. Sys., 542 F.3d at 757 (citing Lulirama Ltd., Inc. v. Axcess Broad Servs., Inc., 128 F.3d 872, 882 (5 Cir. 1997)).  If

[12cv1405-GPC(KSC)]

an implied license accompanied by consideration were revocable at will, the contract would be illusory. Id. at 757.

In California, consideration is defined as "[a]ny benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise." Cal. Civil Code § 1605. Courts "will not weight sufficiency of consideration for promise once it has found it to be of some value." In re Freeman's Estate, 238 Cal. App. 2d 486 (1965).

Plaintiff argues there was not valuable consideration especially if one looks at the fact that she was paid $54,000 for her work on Mango 1.0; however, she does not present any case law to support her argument. Here, Plaintiff was paid around $9,000 for her work on Mango 2.0, which constitutes a benefit conferred. Consideration was paid, and therefore, the implied license is irrevocable. See Asset Mktg. Sys., 542 F.3d at 757.

Lastly, Plaintiff argues that Mango exceeded the scope of its implied license by sublicensing the Work. Defendant argues it did not exceed the scope of its implied license because it only sublicensed to its distributors to sell Mango 2.0. Both parties cite to the same case in support of their argument. See Crispin v. Christian Audigier, Inc., 839 F. Supp. 2d 1086 (C.D. Cal. 2011).

In Crispin, the plaintiff, a tatoo artist, produced Artwork for the defendant and granted a nonexclusive license to use the artwork on the Defendant's line of apparel. However, the defendant used the Artwork on items other than apparel and sublicensed the Artwork without Plaintiff's express permission. Id. at 1088. Plaintiff alleged copyright infringement and filed suit against the defendant and sublicensees. While the plaintiff and the defendant settled, one of the sublicensees filed a cross-claim against the defendant based on fraud, misrepresentation and contract claims. The court addressed the of "whether the holder of a nonexclusive licence must obtain the

[12cv1405-GPC(KSC)]

copyright holder's express permission to sublicense, or whether the right to sublicense can be implied." Id. at 1094. No court has directly dealt with this issue. Id. In synthesizing the Ninth Circuit cases addressing this issue, the court concluded the following:

> In those cases in which the court would not imply a right, the licensee was attempting to assign its license in a way that harmed the owner's retained interest in the property. Specifically, in Gardner[3], an exclusive copyright licensee sought to completely re-assign its license to a third party; in In re CFLC[4], a nonexclusive patent licensee also sought to re-assign its rights to a third party. In both cases, by seeking to assign their rights away to a third party, the licensees were usurping the owner's prerogative of determining who could use the property and how. Although those cases involved outright assignments of licenses, the same reasoning would apply for a licensee who issued a third party an independent sublicense: such sublicensing would allow the sublicensee to use the intellectual property for a purpose wholly different from, and independent of, the purpose for which the licensee was granted its license. Were a licensee vested with such authority by implication, that would usurp the property holder's retained right to control its intellectual property.
>
> In those cases in which the Court did find an implied right, the licensee sublicensed others to perform certain work necessary to effectuate the purpose of its own license. Thus, in Foad[5], in order for the developer to complete the building project for which the architect prepared plans, the developer needed to employ others to modify and publish the plans. Because the developer's "sublicensing" was simply a function of the work the developer needed to do pursuant to its license, the court held that the architect granted the developer the implied right to sublicense in those particular ways, for the specific purpose of completing the project for which the architect created the plans. Similarly, in Effects Assocs.[6], when the owner of the special effects company granted a production company the right to use footage in a film, he also granted the production company the right to sublicense a third party to distribute that footage as part of the film, because distribution is part and parcel of film production.

Id. at 1096.

The Court concludes that Plaintiff has granted Defendant an implied right to sublicense Mango 2.0 to distributors. In this case, Mango sublicenses to distributors

---

[3]Gardner v. Nike, Inc., 279 F.3d 774 (9th Cir. 2002).

[4]In re CFLC, Inc., 89 F.3d 673 (9th Cir. 1996).

[5]Foad Consulting Group, Inc. v. Azzalino, 270 F.3d 821 (9th Cir. 2001)

[6]Effects Assocs., 908 F.2d at 555.

to sell Mango 2.0.  (See Dkt. No. 44-1, Ex. C at 163:15-22.)  Plaintiff has not demonstrated that there is a threat that the sublicensee will harm the owner's interest in the Work or that Mango is seeking to completely re-assigns its license to a third party.  See Crispin, 830 F. Supp. 2d at 1096.  Sublicensing to distribute Mango 2.0 effectuates the purpose of Mango's license to distribute sell Mango 2.0 to customers.

Based on the above, the Court GRANTS Defendant's motion for summary judgment on the copyright right infringement cause of action.

## C.   Quantum Meruit

Defendant argues that Plaintiff cannot raise a genuine material issue of fact because she has no evidence to support the elements of the claim.  First, Defendant argues that Plaintiff has not established that Mango realized any benefit from the creation of the Work aside from its use and commercial exploitation in Mango 2.0 because it cannot derive any benefit from the Work without using it.  Second, it argues that Plaintiff cannot point to any evidence of the reasonable value of her services in creating the Work.

Plaintiff opposes contending that Mango benefits by simply providing her services to create the Work.  Second, she argues that an expert is not needed to testify as to reasonable value of services because she testified as to the reasonable value of her services and the Mango 1.0 Agreement, where she was paid $54,000, provides another measure of reasonable value of her services.

"Quantum meruit (or quasi-contract) is an equitable remedy implied by the law under which a plaintiff who has rendered services benefitting the defendant may recover the reasonable value of those services when necessary to prevent unjust enrichment of the defendant."  In re De Laurentiis Ent. Group Inc., 963 F.2d 1269, 1272 (9th Cir. 1992) (citing B. Witkin, Summary of California Law: Contracts § 91 (1987)).  "Quantum meruit is not the same as a contract implied in fact. Quantum meruit is based not on the intention of the parties, but rather on the provision and receipt of benefits and the injustice that would result to the party providing those

benefits absent compensation." Id.

The Court previously dismissed the quantum meruit claim to the extent it sought compensation for the "use or commercial exploitation" of the Work because such recovery is preempted by the Copyright Act. (Dkt. No. 15 at 6.) The remaining issue is whether she has demonstrated she was not compensated for the "creation of the Work."

The Court notes that there is a conflict in Plaintiff's position on her first and second cause of action. Plaintiff's theory in the copyright infringement cause of action is that while Mango paid for the creation of the Work, it did not pay for the use of the Work. Now, in the quantum meruit cause of action, Plaintiff claims that Mango benefitted from the creation of Plaintiff's Work absent compensation.

The record now before the Court, shows that Plaintiff received and accepted compensation for her creation of the Work. In discovery, "Plaintiff admits that in October 2009 she agreed to get paid at the rate of $25 per hour for inserting her copyrighted work into Mango's online administrative tool. Plaintiff denies that the $25 hourly rate included payment for Mango's use of Plaintiff's copyrighted work." (Dkt. No. 41-5, Kuo Decl., Ex. F at 43.) Again, "Plaintiff admits that she was paid at the rate of $300 per chapter for her efforts in inserting chapters four through ten of copyrighted work into Mango's online administrative tool. Plaintiff denies receiving payment for Mango's use of Plaintiff's copyrighted work despite Mango promising her such payment." (Id. at 46.) When payment was based on the total number of hours the developers devote to Mango 2.0 without any limit, compensation included "all training, developing, editing, reviewing, and communicating." (Dkt. No. 41-4, Goulas Decl. ¶ 19; Ex. I.) Also, when payment was based on the $300 per chapter plan, she accepted the chapter payment and knew it was inclusive of everything. (Dkt. No. 45-3, Perakis Decl. ¶ 20, Ex. L.) Perakis explained to Plaintiff that the $300 per chapter included not only development of the lesson but also "wordification, fragmentation, phonetics, review of audio files, etc." (Id. at MANGO0002465-66.) He also noted that a bonus

1    would be paid following completion of a unit.  (Id.)

2          These facts, not disputed by Plaintiff, demonstrate that she was paid for

3    Plaintiff's work on Mango 2.0 and Mango was not unjustly enriched.[7]  Accordingly,

4    the Court GRANTS Defendant's motion for summary judgment on the quantum meruit

5    cause of action.

6    **D.     Evidentiary Objections**

7          Plaintiff filed evidentiary objections to Mango's evidence in support of its

8    motion for summary judgment. (Dkt. No. 44-7.)  Mango filed evidentiary objections

9    to Plaintiff's evidence in opposition to motion for summary judgment. (Dkt. No. 46-4.)

10   The Court notes the objections.  To the extent that the evidence is proper under the

11   Federal Rules of Evidence, the Court considered the evidence.  To the extent that the

12   evidence is not proper, the Court did not consider it.

13                              **Conclusion**

14         Based on the above, the Court GRANTS Defendant's motion for summary

15   judgment on the copyright infringement cause of action and GRANTS Defendant's

16   motion for summary judgment on the quantum meruit cause of action.  The Clerk of

17   Court shall issue final judgment accordingly and shall close the case.

18         IT IS SO ORDERED.

19

20   DATED:  August 6, 2014

21

22                              HON. GONZALO P. CURIEL
                                United States District Judge

23

24

_____

25         [7]Plaintiff points to the Court's footnote in its order granting in part and denying
     in part Defendant's motion to dismiss where the Court disagreed with Defendant's
26   argument that because Plaintiff received a nominal payment for the Work, she could
     not state a claim for quantum meruit. (Dkt. No. 15 at 6.)  The standard on a motion to
27   dismiss and a motion for summary judgment is different.  At summary judgment, the
     Court looks to the facts revealed through discovery.  The fact presented demonstrates
28   that Plaintiff cannot create a genuine issue of material fact on the quantum meruit
     claim.

[12cv1405-GPC(KSC)]